James Richard ODLE, Petitioner,

v.

Daniel B. VASQUEZ, Defendant.

No. C–88–4280–CAL.

United States District Court,
N.D. California.

Dec. 27, 1990.

Warren W. Wilson, Lillick & Charles, San Francisco, Cal., for petitioner.

Blair Hoffman, Dane Gillette, and Laurence Sullivan, Deputy Attys. Gen., San Francisco, Cal., for defendant.

## OPINION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

LEGGE, District Judge.

### I.

This is a petition for a writ of habeas corpus filed under 28 U.S.C. § 2254 by

James Richard Odle, a prisoner in state custody. Petitioner is under sentence of death. Petitioner is represented by counsel appointed to him by this court pursuant to N.D.Cal.Local R. 296, ¶ 4.

The petition alleges seven claims of constitutional error in petitioner's state trial and death sentence. The state has filed an answer denying that the trial and sentence were unconstitutional. The state has not argued that any of petitioner's claims raise "new constitutional rules" which cannot be considered by this court under *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); and this court is not required to consider the question *sua sponte*. See *Collins v. Youngblood*, —— U.S. ——, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990). Petitioner has filed a traverse and, after oral argument, the petition was submitted to the court for decision. This court has reviewed the record of this proceeding, the state court record,[1] the briefs and arguments of counsel, and the applicable authorities. It has done so with the principle in mind that "the federal judiciary must ... take particular care in death penalty cases to give patient and thoughtful review of claims presented by petitioners through their appointed counsel." *Mercer v. Armontrout*, 864 F.2d 1429, 1433 (8th Cir.1988).

## II.

The facts of the crime of which petitioner was convicted are not directly relevant to this petition. Those facts are undisputed here, and are set forth in the California Supreme Court's opinion affirming petitioner's conviction. See *People v. Odle*, 45 Cal.3d 386, 394–401, 247 Cal.Rptr. 137, 754 P.2d 184, *cert. denied*, 488 U.S. 917, 109 S.Ct. 275, 102 L.Ed.2d 263 (1988).

Four of petitioner's seven claims in this petition are based upon an extensive brain injury which he suffered before his commission of the crime. In 1973 petitioner was involved in a serious auto accident. He suffered a skull fracture, and the temporal lobe of his brain was lacerated and hemorrhaged. After almost a year of documented mental difficulties, the attending neurosurgeon performed an operation and removed a substantial portion of the temporal lobe region of petitioner's brain. The procedure is referred to as a temporal lobectomy. 20 RT 24–27.

Petitioner's surgeon testified that after the operation, petitioner was irrational, emotional and angry. 20 RT 25–35. Petitioner complained of spells of losing control, and he expressed his fear that he might hurt or kill someone. 20 RT 30–35. Petitioner's acquaintances, friends and relatives testified to varying degrees of marked change in petitioner's behavior and disposition after the 1973 accident. 20 RT 88–95; 17 RT 10–15, 21; 28 RT 50–60; 13 RT 78. Petitioner's 1980 and 1982 EEG tests each revealed at least some abnormalities. Petitioner presented expert testimony to the effect that some temporal lobectomy patients have been known to become excessively emotional and irrational and to lose control of themselves. 20 RT 23; 21 RT 40; 21 RT 102–04.

In rebuttal, the state introduced evidence of petitioner's criminal record prior to and since the accident. 21 RT 140–42. The state also introduced expert testimony that there was no automatic relationship between petitioner's injury and his criminal behavior. The state's expert testified that there was no evidence of diminished capacity in connection with the crime. The expert's opinion was that petitioner's actions indicated that he was able to and did think rationally during the commission of the crime. 22 RT 8–19.[2]

---

1. The record was lodged with the court and supplemented by respondent pursuant to N.D. Cal.Local R. 296 ¶ 9. Petitioner has not objected to the completeness or accuracy of the documents lodged and the court has no reason to doubt that the record, as supplemented, is complete and accurate. References to the record are made using the abbreviations and conventions employed in respondent's Notice of Lodging of Index and Records.

2. Additional facts relevant to the determination of this petition are stated below in the discussions of petitioner's claims, and are undisputed except where noted.

The jury heard the evidence, including the conflicting medical evidence, and convicted petitioner of the crime. At the conclusion of the penalty phase of the trial, the jury sentenced him to death.

Most of petitioner's claims here do not concern his conviction, but instead pertain to the penalty phase of his trial and the resulting sentence of death.

### III.

Petitioner's first contention is that at the penalty phase of his trial, the jury was precluded by the trial court's instructions from adequately considering evidence of his brain injury, background and character.

■ Petitioner has a constitutional right to have his penalty jury hear and be able to give effect to all relevant mitigating evidence, including evidence of his background and character. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Petitioner's penalty jury was instructed using the language of CALJIC [3] No. 8.84.1:

In determining which penalty is to be imposed on the defendant you shall consider all of the evidence which has been received during any part of the trial of this case.

You shall consider, take into account and be guided by the following factors, if applicable:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

(b) The presence or absence of criminal activity by the defendant which involves the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction.

(d) Whether or not the offense was committed while the defendant was un-

der the influence of extreme mental or emotional disturbance.

(e) Whether or not the defendant [sic] was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to a moral justification or extension [sic] or extenuation for his conduct.

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of a person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of a mental disease or defect or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor and,

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

29 RT 89–90.

The trial court augmented this CALJIC instruction with the following instructions requested by petitioner [4]:

Mitigation is defined as an abatement or diminution of a penalty or punishment imposed by law.

Mitigating circumstances are such so as not to constitute a justification or excuse for the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability.

.        .        .        .        .

You were previously instructed in the guilt phase of this trial that sympathy or

---

**3.** CALJIC (3d ed. 1978). The enumerated aggravating and mitigating circumstances contained in this instruction are based upon Cal.Penal Code § 190.3(a–k).

**4.** The trial court adopted and gave all of the instructions requested by petitioner, except for one sentence not relevant here. CT 1746; 28 RT 73–74.

pity for a defendant should not influence your consideration of the evidence. In this, the penalty phase of the trial, the jury may properly consider sympathy or pity for the defendant in determining whether to show mercy and spare the defendant from execution.

In deciding whether the defendant, Mr. Odle, should be sentenced to death or to life in prison without the possibility of parole, you must weigh the mitigating circumstances against the aggravating circumstances that you find to be established by the evidence.

The fact that you have previously found Mr. Odle guilty beyond a reasonable doubt of the crimes of murder in the first degree is not in itself an aggravating circumstance.

29 RT 90–91.

■ Petitioner's contention is that the enumerated CALJIC mitigating factors—specifically factors (d), (h) and (k), which pertain most closely to the evidence of his brain injury—limited the jury's consideration of such mitigating evidence to events which were *directly connected* to the crime. Petitioner argues that this limitation is constitutionally impermissible, because it precludes the jury's consideration of his general background and character, unrelated to the specific crime.

Factor (d) speaks of whether "the offense was committed." Factor (h) says "at the time of the offense." Factor (k) is in terms of "the crime." Petitioner contends that although the jury heard the evidence of his brain injury and its possible consequences, the jury was precluded from giving effect to that evidence unless it was directly connected to the crime. Hence, petitioner argues, the jury was prevented by the instructions from concluding that as a result of his brain injury and all of its effects, death was not the appropriate punishment. Pet. at 45–52.

The California Supreme Court rejected petitioner's argument. *See Odle*, 45 Cal.3d at 421, 247 Cal.Rptr. 137, 754 P.2d 184. It held that any inference in CALJIC 8.84.1 that the mitigating evidence must be directly connected to the crime itself was cured

in this case by the prosecutor's arguments, defense counsel's arguments, and the additional jury instructions given at petitioner's request. *Id.* at 417–19, 247 Cal.Rptr. 137, 754 P.2d 184.

The California Supreme Court has noted possible ambiguity in CALJIC 8.84.1. In *People v. Easley*, 34 Cal.3d 858, 878, 196 Cal.Rptr. 309, 671 P.2d 813 (1983), the court said that "there is some force to [the] argument that the wording of [CALJIC 8.84.1] is potentially confusing. . . ." In an often-cited footnote, the court suggested that "[i]n order to avoid potential misunderstanding in the future, trial courts . . . should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime,' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " *Id.* at 878 n. 10, 196 Cal.Rptr. 309, 671 P.2d 813. The *Easley* court, however, found it unnecessary to decide the constitutionality of the instruction. *Id.* at 878, 196 Cal.Rptr. 309, 671 P.2d 813.

The issue which petitioner raises has now been resolved by the United States Supreme Court's recent decision in *Boyde v. California*, ── U.S. ── 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), decided after this petition was filed. In *Boyde*, the Court was presented squarely with the question of the constitutionality of CALJIC 8.84.1. Counsel in *Boyde* advanced the same argument that petitioner does here:

Petitioner contends that none of the 11 statutory factors in CALJIC 8.84.1 allowed the jury to consider non-crime-related factors, such as his background and character, which might provide a basis for a sentence less than death.

*Boyde*, 110 S.Ct. at 1196–97.

The *Boyde* Court first set forth the standard for reviewing jury instructions for alleged constitutional error. After noting that its prior decisions had lacked uniformity on the standard (*see Boyde* 110 S.Ct. at 1197), the Court held that:

the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such inhibition.

*Id.* 110 S.Ct. at 1198.

The Court then applied this standard to CALJIC 8.84.1, and held:

[W]e think there is not a reasonable likelihood that Boyde's jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character. The jury was instructed, according to factor (k), that 'you shall consider ... [a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime,' and the term 'extenuate' was defined by the court to mean 'to lessen the seriousness of a crime as by giving an excuse.' ... Petitioner had an opportunity through factor (k) to argue that his background and character 'extenuated' or 'excused' the seriousness of the crime, and we see no reason to believe that reasonable jurors would resist the view, 'long held by society,' that in an appropriate case such evidence would counsel imposition of a sentence less than death. The instruction did not, as petitioner seems to suggest, limit the jury's consideration to 'any other circumstance *of the crime* which extenuates the gravity of the crime.' The jury was directed to consider *any other circumstance* that might excuse the crime, which certainly includes a defendant's background and character.

*Id.* 110 S.Ct. at 1198–99 (emphasis in original).

The Court also noted that other factors contributed to its holding, including the fact that CALJIC 8.84.1 allows for other mitigating factors not associated with the crime itself such as absence of prior criminal activity and defendant's youth. *Id.;* see CALJIC 8.84.1(c), (i). "When factor (k) is viewed together with those instructions, it seems even more improbable that jurors would arrive at an interpretation that precludes consideration of all non-crime-related evidence." 110 S.Ct. at 1199. The Court also discussed in support of its holding that the defendant had introduced evidence of his background and character. "[O]ver 400 pages of trial transcript [ ] related to petitioner's background and character...." *Id.* at 1199. "[I]n our view reasonable jurors surely would not have felt constrained by the factor (k) instruction to *ignore all* of the evidence presented by petitioner during the sentencing phase." *Id.* at 1199–1200 (emphasis in original).

Applying these holdings and statements to petitioner's claim here, this court concludes that the state trial court did not commit constitutional error by instructing the jury in the language of CALJIC 8.84.1. The text of CALJIC 8.84.1 was given substantially verbatim, as it was in *Boyde*. The non-crime-related factor instructions that the *Boyde* Court found significant were also given in this case. *See* 29 RT 89–90. The defense presented substantial evidence of petitioner's background and character—specifically his 1973 injury, his subsequent temporal lobectomy, and the behavior changes it precipitated.

Since *Boyde* was decided after this petition was filed and briefed, this court asked for supplemental briefing on the applicability of *Boyde*. In that briefing, petitioner urges certain distinctions between *Boyde* and his case. Petitioner argues that in addressing factor (k), the prosecutor in *Boyde* specifically discussed defendant's background, and did not argue that factor (k) was limited to matters directly connected to the crime itself. Petitioner correctly notes that in this case the prosecutor, in discussing factor (k), stated:

Other extenuating circumstances regarding the gravity of the crimes. [Referring to factor (k)] That is, is there anything about the crimes that you can think of—sit down and say to yourself I'm

going to try to think of anything in Jim Odle's favor regarding how he committed those crimes which are [sic] extenuating, and you won't be able to do it because there is nothing extenuating about those crimes.

29 RT at 31–32. The prosecutor referred three times to the "crimes," as if to limit the jury's consideration of the mitigating evidence to that directly connected to the crimes themselves. Prosecutorial misstatements have sometimes been recognized as having a decisive effect on a jury, and may thus render a conviction and sentence unconstitutional. *See Boyde,* 110 S.Ct. at 1200.

The California Supreme Court noted the prosecutor's comments in its opinion affirming petitioner's conviction and sentence. *Odle,* 45 Cal.3d at 418 n. 13, 247 Cal.Rptr. 137, 754 P.2d 184. The court observed that "[i]n numerous other references, however, the prosecutor gave the jury the opposite (and correct) message that the jury should properly *consider* all of defendant's character and mental condition evidence...." *Id.* at 418, 247 Cal. Rptr. 137, 754 P.2d 184 (emphasis in original).

The prosecutor also said:

> [Y]ou are the judges of defendant's character, his history, and what should be done with him.... you are entitled to feel pity for him, sympathy for him.

29 RT 8.

> [T]he law is that the jury may take into account sympathy factors for the defendant because you are at the sentencing phase, you are acting like the judge who looks at the probation report, covers the guy's entire background, you are looking at his record, any social factors, and you are looking at his mental workup, and you are looking at the factors of the crime, and then you are deciding what should be done with this man. And that's what you are doing. So sympathy is part of it and you would be wrong not to at least say we'll consider it.

. . . . .

We are talking about Jim Odle, his character, his background, what he did. 29 RT 33.

Further, the prosecutor's argument regarding factor (k) did not refer to factors (d) and (h). Even if the jury felt constrained under factor (k), the argument did not restrict the jury's consideration of petitioner's brain injury under factors (d) and (h).

■ The arguments of the prosecutor, like the instructions of the court, must be judged in the context in which they are made. *Boyde,* 110 S.Ct. at 1200; *Greer v. Miller,* 483 U.S. 756, 766, 107. S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987); *Darden v. Wainwright,* 477 U.S. 168, 179, 106 S.Ct. 2464, 2470, 91 L.Ed.2d 144 (1986). The passages quoted above make it less "reasonably likely" that the jury was misled into thinking that it could not consider petitioner's non-crime-related evidence in deciding the appropriate penalty.

Another part of the context in which jury instructions must be viewed is defense counsel's argument. Defense counsel repeatedly returned to the theme that the jury must consider petitioner's history and character in deciding the appropriate penalty:

> [W]hat the jury has to do in a penalty case is really to consider anything that they feel or an individual feels is appropriate.
>
> As an example: you are allowed to consider mitigation or extenuation....
>
> Mitigating circumstances are such as to not constitute a justification or excuse of the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability.
>
> So the concept of mercy enters your deliberation as it does not in the guilt phase.

. . . . .

> In this the penalty phase of the trial, the jury may properly consider sympathy or pity for a defendant in determining whether to show mercy and spare the defendant from execution....

So in the other circumstance which is not a legal excuse, I'm not talking about excusing his conduct, I'm talking about considering his conduct and trying to make a determination whether there is an extenuating circumstance that is sufficient in your mind not to require him to be executed.

29 RT 66–67.

Defense counsel then spoke of the accident and the brain injury petitioner sustained. "What we will never know is what could have happened had that accident not occurred. And you must consider that." 29 RT 73. Counsel then devoted seven pages of argument to the mental impairment evidence and the need for its consideration by the jury. 29 RT 73–80. Finally, counsel summed up, in part, by asking:

is [the brain injury] not an impairment of the mental capacity which must be considered an extraordinary mitigating factor when you have to determine whether Jim Odle has to be killed.

29 RT 82.

There could be no mandate in justice or fairness to execute a man whose human capacities were altered when part of his brain was removed.

The law envisions this kind of mitigating factor as one that must be given significant weight in the terrible decision whether a man is killed or allowed to live.

29 RT 86.

These arguments of defense counsel are part of the context of the instructions to the jury. There can be little doubt that they served to lessen the possibility that the jury was misled into thinking that it could consider only the circumstances surrounding the crime itself in deciding the proper penalty.

The context of the challenged jury instructions also includes the additional jury instructions which were given at petitioner's request. In addition to CALJIC 8.84.1, the trial judge gave the instructions requested by petitioner which are quoted above on page 7. 29 RT 90–91.

The additional instructions diminished any likelihood that the jury was misled into resisting consideration of petitioner's brain damage, history and character. The California Supreme Court "conclude[d] the jury was not misled ... and ... was in fact left with the correct understanding that it was to consider defendant's mental condition, and his character, as mitigating factors in determining the appropriate penalty." *Odle*, 45 Cal.3d at 419, 247 Cal.Rptr. 137, 754 P.2d 184 (citations omitted).

This court concludes that petitioner has not shown that there was a reasonable likelihood that the jury was misled. *Boyde's* holding in support of CALJIC 8.84.1, combined with both counsels' closing arguments and the supplemental jury instructions given at petitioner's request, compel the conclusion that this claim of constitutional error must be dismissed.

## IV.

■ Petitioner's second claim is that California Penal Code section 190.3 impermissibly removed sentencing discretion from the jury by making death mandatory if petitioner did not raise sufficient mitigating evidence to outweigh the aggravating evidence.

Cal.Penal Code Section 190.3 provides in relevant part:

After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without possibility of parole.

This statute forms the basis of CALJIC 8.84.2. And CALJIC 8.84.2 was used, substantially verbatim, in instructing the jury in the death penalty phase. *See* 29 RT 95.

Petitioner makes two arguments in support of the constitutional invalidity of this instruction. First, petitioner argues that the mandatory language impermissibly bound the jury's discretion. That is, petitioner asserts that instructing the jury that it *"shall"* impose death if the aggravating circumstances outweigh the mitigating circumstances interferes with the individualized sentencing required by the Constitution. Second, petitioner argues that the instruction sets up a presumption that death is the proper penalty *unless* the defendant comes forward with enough mitigating evidence, and such a presumption is unconstitutional.

Death penalty statutes with mandatory language were recently reviewed by the U.S. Supreme Court in *Blystone v. Pennsylvania,* —— U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). The statute at issue in *Blystone* provided in relevant part as follows:

> [T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

42 Pa.Cons.Stat. § 9711(c)(1)(iv) (1988); *Blystone,* 110 S.Ct. at 1081. Petitioner here agrees that at least with respect to the issue of the mandatory language of the statute, the Pennsylvania statute is "substantially similar" to Cal.Penal Code section 190.3. Pet. at 53 n. 6.

The Supreme Court in *Blystone* upheld the statute as constitutional. The Court rejected a challenge to the mandatory language based on *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978):

> We think that the Pennsylvania death penalty statute satisfies the requirement that a capital-sentencing jury be allowed to consider and give effect to all relevant mitigating evidence.

*Blystone,* 110 S.Ct. at 1082.

The Court also rejected the challenge to the Pennsylvania statute made on the basis of *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976), which required "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." The *Blystone* Court held:

> Nor is the statute impermissibly 'mandatory' as that term was understood in *Woodson* or *Roberts* [ *v. Louisiana,* 428 U.S. 325, 333–34, 96 S.Ct. 3001, 3006–07, 49 L.Ed.2d 974 (1976) ]. Death is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances.
>
> .    .    .    .    .
>
> The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.

*Blystone,* 110 S.Ct. at 1082–83 (footnotes omitted).

In *Boyde* the Supreme Court relied on *Blystone* (which it had decided the week before) in rejecting a challenge to Cal.Penal Code section 190.3 nearly identical to petitioner's present claim. The Court wrote:

> We need not discuss petitioner's claim at length, because we conclude that it is foreclosed by our decision earlier this term in *Blystone....* Although Blystone, unlike Boyde, did not present any mitigating evidence at the penalty phase of his capital trial, the legal principle we expounded in *Blystone* clearly requires rejection of Boyde's claim as well, because the mandatory language of CAL-JIC 8.84.2 is not alleged to have interfered with the consideration of mitigating evidence. Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances 'outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration

of mitigating evidence.... Petitioner's claim that the 'shall impose' language of CALJIC 8.84.2 unconstitutionally prevents 'individualized assessment' by the jury, is thus without merit.

*Boyde,* 110 S.Ct. at 1196.

The instruction here in issue is not constitutionally infirm. There is no constitutional requirement that juries be free to decline to impose death when aggravating circumstances outweigh mitigating ones. The Supreme Court rejected this very argument in *Boyde.* Nor does the mandatory language of the instruction render it unconstitutional. *Blystone,* 110 S.Ct. at 1082–83. This court therefore concludes that *Boyde* and *Blystone* compel rejection of petitioner's claim.

■ Petitioner's second argument stands on different footing. This argument focuses on the first of the enumerated factors in CALJIC 8.84.1:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

Petitioner correctly notes that the circumstances of a murder are established at the guilt phase. Likewise, at least one special circumstance had to have been established in the guilt trial in order to subject him to a possible death penalty in the second phase. *See* Cal.Penal Code § 190.2.[5]

Petitioner asserts that under factor (a), he "enter[ed] the penalty phase already carrying at least one aggravating circumstance attributable to [his] crime." Pet. at 56. In other words, under the California statute, if neither the prosecution nor the defense introduces any evidence of aggravation or mitigation in the penalty trial, the jury must impose the death sentence be-

cause the defendant, by definition, comes into the penalty trial with an aggravating circumstance already tipping the balance against him.

The effect of a special circumstance finding in the guilt trial on the subsequent penalty trial has been noted by the California Supreme Court in *People v. Brown,* 40 Cal.3d 512, 541–42 n. 13, 230 Cal.Rptr. 834, 726 P.2d 516 (1985), *rev'd on other grounds,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987):

At a capital penalty trial, defendant has already been convicted of committing, without legal excuse, an intentional first degree murder with at least one "special circumstance" necessary to make him eligible for the death penalty.... It would be rare indeed to find mitigating evidence which could redeem such an offender or excuse his conduct in the abstract. Recognizing this, the statute requires *at a minimum,* that he suffer the penalty of life imprisonment without parole. (Emphasis in original).

Petitioner therefore contends that this portion of the California statute amounts to a presumption that the sentence should be death. That is, if neither side introduces evidence at the penalty phase, the jury must return a verdict of death, and only the by bringing forward mitigating evidence can a defendant affect the presumption favoring death.

The Ninth Circuit has held that a death penalty statute which presumes death to be the appropriate penalty, and which places on defendants the burden of proving otherwise, is unconstitutional. *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990).[6] In *Adamson,* the court held that:

---

**5.** Section 190.2 provides in relevant part:

(a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true....

The statute then enumerates 19 special circumstances.

**6.** In *Walton v. Arizona,* —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Supreme Court upheld Arizona's capital sentencing scheme. The Court, however, did not consider the issue of the constitutionality of a statute that establishes a presumption that death is the appropriate penalty.

[i]n imposing this presumption [that death is the appropriate penalty] the [Arizona death penalty] statute precludes the individualized sentencing required by the Constitution. It also removes the sentencing judge's discretion by requiring the judge to sentence the defendant to death if the defendant fails to establish mitigating circumstances by the requisite evidentiary standard, which *outweigh* the aggravating circumstances.

*Id.* at 1042–43 (emphasis in original).

However, the Supreme Court's later decisions in *Blystone* and *Boyde* considered statutes that are in relevant part identical to the Arizona statute. And the Supreme Court found no presumption favoring death in those statutes.

Petitioner here argues that the California statute presents an even greater burden for a defendant than does the Arizona statute, because the aggravating circumstance categories in the Arizona statute do not include the circumstances of the crime itself. Thus, petitioner argues, an Arizona defendant does not begin the sentencing phase with one aggravating circumstance already found against him. According to petitioner, whatever the status of the Ninth Circuit's decision in *Adamson* may be after *Boyde* and *Blystone*, the present case goes beyond *Adamson* in that the California statute defines the weighing process in favor of the state. Petitioner asserts that the law applied in *Adamson* is still good law; specifically, that *Adamson* holds that a presumption of death, even coupled with unobstructed receipt and consideration of mitigating evidence, is unconstitutional. *Adamson*, 865 F.2d at 1041–42. This holding is in accord with the Eleventh Circuit's decision in *Jackson v. Dugger*, 837 F.2d 1469 (11th Cir.), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). Thus, if the instructions at issue here, taken as a whole (*see Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)), do give rise to a pre-

sumption of death as being the appropriate penalty, the instructions would be unconstitutional.

This court has found no case answering the question of whether the aggravating circumstance of Cal.Penal Code section 190.3(a) amounts to a presumption in favor of the death penalty. In *People v. Melton*, 44 Cal.3d 713, 244 Cal.Rptr. 867, 750 P.2d 741, *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988), the California Supreme Court wrote approvingly of section 190.3(a). The court rejected a challenge, based on Cal.Penal Code section 654[7], to section 190.3(a). The court found unpersuasive the reasoning of the plurality in *People v. Harris*, 36 Cal.3d 36, 64–65, 201 Cal.Rptr. 782, 679 P.2d 433, *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984), and held that it is constitutional to permit the penalty jury to give independent aggravating weight to felonies committed in the course of the murder, even though some of those felonies may have been charged as special circumstances in the guilt trial. *Melton*, 44 Cal.3d at 766–68, 244 Cal.Rptr. 867, 750 P.2d 741. But the court did not address the issue of whether the statute was, in effect, a presumption of death, and if so whether it would be unconstitutional.

In *People v. Andrews*, 49 Cal.3d 200, 260 Cal.Rptr. 583, 776 P.2d 285 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990), the California Supreme Court considered a challenge to the "mandatory language" portion of CALJIC 8.84.2. CALJIC 8.84.2 informs a penalty jury that it "shall" impose a penalty of death if it finds the aggravating circumstances outweigh the mitigating circumstances. The court rejected the argument that *Jackson* and *Adamson* compel the conclusion that such an instruction is improper. *Andrews*, 49 Cal.3d at 229–30, 260 Cal.Rptr. 583, 776 P.2d 285. The court distinguished *Jackson*

---

7. Section 654 provides:

An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished

under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other.

and *Adamson* stating that the instructions in those cases:

suffer from a similar defect: in each the sentencing entity is told that a sentence of death is the norm, and that a lesser penalty may be imposed only if the defense presents sufficient mitigating evidence. In both instances, the accused bore the burden of demonstrating that death was not an appropriate penalty. In contrast, [CALJIC 8.84.1] merely told the jurors that if they concluded the aggravating circumstances outweighed the mitigating circumstances, they were to impose a sentence of death; but if they determined the mitigating circumstances outweighed the aggravating circumstances, they were to impose a sentence of confinement in the state prison for life without the possibility of parole. Unlike the language involved in *Jackson* and *Adamson,* the language at issue here does not create a presumption in favor of death.

*Andrews,* 49 Cal.3d at 230, 260 Cal.Rptr. 583, 776 P.2d 285. The California court did not discuss whether the first statutory aggravating circumstance category, section 190.3(a), operates as a presumption that death is the appropriate penalty. The court merely rejected the argument that *Jackson* and *Adamson* had undermined the constitutionality of CALJIC 8.84.2 standing alone. The issue of the effect of section 190.3(a) therefore remains open.

However, this court must consider the effect of section 190.3(a) and CALJIC 8.84.-1(a) not in the abstract, but as they applied in petitioner's trial. It comes to a question of what the jury was told, not "in artificial isolation, but ... viewed in the context of the overall charge." *Naughten,* 414 U.S. at 147, 94 S.Ct. at 400. Petitioner's argument, that the section 190.3(a) instruction burdened him with an aggravating circumstance before the prosecution introduced any penalty phase evidence, is answered by the next instruction which the jury was then given at petitioner's request:

In deciding whether the defendant, Mr. Odle, should be sentenced to death or to life in prison without the possibility of parole, you must weigh the mitigating circumstances against the aggravating circumstances that you find to be established by the evidence.

*The fact that you have previously found Mr. Odle guilty beyond a reasonable doubt of the crimes of murder in the first degree is not in itself an aggravating circumstance.*

29 RT 91 (emphasis added).

Thus, the jury was instructed that petitioner did *not* come to the penalty trial with any pre-existing aggravating factors. Whatever may be said about the bare language of a section 190.3(a) instruction, it cannot be said that it was "reasonably likely" that the jury in this case was left with the understanding that petitioner had an aggravating circumstance against him simply as a result of the guilty verdict. The jury was expressly instructed to the contrary.

For the reasons stated, petitioner's claims of constitutional error in the jury instructions must be dismissed.

### V.

Petitioner's next claim is that his death sentence violates the Eighth Amendment, because it is inherently disproportionate in light of his severe brain damage.

■ The Eighth Amendment prohibits the infliction of cruel and unusual punishment. *Ford v. Wainwright,* 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986). The scope of the prohibition against cruel and unusual punishment is measured by reference to "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958); *Ford,* 477 U.S. at 406, 106 S.Ct. at 2600; *Baumann v. Arizona Dep't of Corrections,* 754 F.2d 841 (9th Cir.1985). In defining those evolving standards, courts look to objective evidence of how society views a particular punishment. *See Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 2953–58, 106 L.Ed.2d 256 (1989); *Enmund v. Florida,* 458 U.S. 782, 788–96, 102 S.Ct. 3368, 3371–76, 73 L.Ed.2d 1140 (1982); *Coker v. Georgia,* 433 U.S. 584, 593–97, 97

S.Ct. 2861, 2866–68, 53 L.Ed.2d 982 (1977). The chief indicia of society's perception of punishments are the laws enacted by the country's legislatures and the actions of sentencing juries. *Penry,* 109 S.Ct. at 2953.

■ One aspect of the Eighth Amendment's protection is the requirement that the punishment be proportionate to the crime and to the culpability of the defendant. In order to impose the death sentence, a state must prove the defendant's personal blameworthiness or moral culpability for the acts committed. *Enmund,* 458 U.S. at 797–801, 102 S.Ct. at 3376–78; *Tison v. Arizona,* 481 U.S. 137, 146–52, 107 S.Ct. 1676, 1682–85, 95 L.Ed.2d 127 (1987); *Haygood v. Younger,* 769 F.2d 1350 (9th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). The death penalty must be "directly related to the personal culpability of the criminal defendant." *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring).

■ A second aspect of the Eighth Amendment's protection is the requirement that the penalty serve a valid penological purpose. *Spaziano v. Florida,* 468 U.S. 447, 460 n. 7, 104 S.Ct. 3154, 3162 n. 7, 82 L.Ed.2d 340 (1984); *Zant v. Stephens,* 462 U.S. 862, 876–77, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *Enmund,* 458 U.S. at 798–99, 102 S.Ct. at 3377–78. A punishment is constitutionally impermissible if it "makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering." *Coker,* 433 U.S. at 592, 97 S.Ct. at 2866; *Enmund,* 458 U.S. at 798, 102 S.Ct. at 3377.

■ Petitioner argues that (1) his brain injury so reduced his personal blameworthiness as to make the death penalty an unconstitutionally disproportionate punishment; and (2) execution of a person with such brain damage serves no valid penological purpose. The state replies that the U.S. Supreme Court's holding in *Penry* is to the contrary.

There have been few cases in which the Supreme Court has invalidated a death sentence on the basis of disproportionality or lack of a legitimate penological purpose. In 1977, the Court held that the death penalty for rape of an adult woman is punishment disproportionate to the crime, and therefore a violation of the Eighth Amendment. *Coker,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982. In 1982, the Court held that the Eighth Amendment prohibits the execution of defendants who participate in a crime during the course of which a capital crime is committed, but did not themselves take, or attempt or intend to take a life, or intend that lethal force be used. *Enmund,* 458 U.S. at 797, 102 S.Ct. at 3376. In 1986, execution of the insane was held to violate the Eighth Amendment. *Ford,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335. In 1988, the Court held that execution of minors who committed capital crimes while under the age of 16 was unconstitutional under the Eighth Amendment. *Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). No case has addressed the constitutionality of executing a person who has undergone a temporal lobectomy. However, in *Penry,* the Supreme Court found insufficient evidence of a national consensus against "executing mentally retarded people convicted of capital offenses for [it] to conclude that it is categorically prohibited by the Eighth Amendment." *Penry,* 109 S.Ct. at 2955.

In support of his argument on lack of proportionality, petitioner draws this court's attention only to *Fitzpatrick v. State,* 527 So.2d 809 (Fla.1988). But *Fitzpatrick* is not instructive in analyzing this case. In *Fitzpatrick,* the Florida Supreme Court found that "[t]he record on resentencing is replete with evidence of Fitzpatrick's substantially impaired capacity, his extreme emotional disturbance, and his low emotional age." *Id.* at 811. The court then engaged in a proportionality analysis and concluded that "in comparison to other cases involving imposition of the death penalty, this punishment is unwarranted in this case." *Id.* at 812. But that type of analysis does not necessarily agree with the

method of analysis of the U.S. Supreme Court.

Two separate kinds of proportionality review have been defined by the U.S. Supreme Court:

Traditionally, 'proportionality' has been used with reference to an abstract evaluation of the appropriateness of a sentence for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime.

. . . .

[The second] sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.

*Pulley v. Harris*, 465 U.S. 37, 42–43, 104 S.Ct. 871, 875–876, 79 L.Ed.2d 29 (1984) (citations omitted). The traditional proportionality review is required by the Constitution. The second, or "comparative" type of proportionality review, is not constitutionally required if the state's sentencing scheme otherwise provides sufficient checks on arbitrariness. *Id.* at 50–51, 104 S.Ct. at 879–880.

A number of states require a comparative proportionality review by statute. *E.g.*, Ga.Code Ann. § 17–10–35(c)(3) (1988). In *Pulley v. Harris*, the Court held that in states which provide for a capital sentencing scheme with sufficient checks on arbitrary imposition of death sentences, an additional comparative proportionality review is not constitutionally required. 465 U.S. at 50–51, 104 S.Ct. at 879–880. The Court noted that the California capital sentencing scheme bears sufficient checks on arbitrari-

ness so as not to require a comparative proportionality review. *Id.* at 53–54, 104 S.Ct. at 880–881.

It was this "comparative" proportionality review in which the Florida Supreme Court engaged in *Fitzpatrick*. Because such a review is not mandated on federal habeas corpus, which authorizes relief only for federal constitutional violations, *Fitzpatrick* is inapposite.

The state argues that petitioner's brain disorder is analytically indistinguishable from that considered in *Penry*. In *Penry*, a "mildly to moderately retarded" petitioner, with an IQ of 54 and a "mental age" of 6.5, argued "that execution of a mentally retarded person like himself ... would be cruel and unusual because it is disproportionate to his degree of personal culpability." *Penry*, 109 S.Ct. at 2941, 2956. Justice O'Connor then surveyed the current knowledge about the effect of mental retardation. She concluded that mentally retarded persons are not, by virtue of their mental retardation alone, incapable of acting "with the level of culpability associated with the death penalty." *Id.* at 2957. However, the opinions of the individual Justices in *Penry* reveal that Part IV–C of Justice O'Connor's opinion—the part dealing with the issue of proportionality—did not command a majority. Justices Brennan, Marshall, Stevens and Blackmun dissented from IV–C, stating that they would hold that it *is* unconstitutionally disproportionate to sentence a mentally retarded person to death. *Id.* at 2958, 2963. The Chief Justice, and Justices Scalia, White and Kennedy dissented from IV–C, stating that there is no place for such a proportionality analysis in Eighth Amendment jurisprudence. *Id.* at 2964. The precedential value of that part of Justice O'Connor's opinion is therefore questionable.

Again, however, this court must consider the issues not in the abstract, but in the context of the record in this case. The record of the trial contains expert testimony on the effects of petitioner's temporal lobectomy.[8] All of the testimony was to

---

8. Petitioner called three experts to testify on this     subject: Dr. Blum, the surgeon who performed

the effect that abnormalities in terms of rage, temper and the inability to maintain or regain control of oneself have been observed in *some* temporal lobectomy patients. *See, e.g.,* 21 RT 40–42, 102, 115. However, the expert testimony was that many temporal lobectomy patients do not exhibit any such abnormalities. On this record, it cannot be held as a matter of constitutional law that petitioner lacked the cognitive, volitional or moral capacity to act with the degree of culpability generally associated with imposition of the death penalty. Rather, it was a question of fact whether petitioner was one of those people who suffered from a lack of emotional and volitional control after a temporal lobectomy. That question was properly left to the jury.

The jury was allowed to consider the evidence of petitioner's brain condition, including the expert testimony from both sides. The jury was instructed that if it found that petitioner had a diminished capacity, he would be guilty only of manslaughter and not murder. 23 RT 126. The jury rejected petitioner's diminished capacity defense, impliedly finding that petitioner was not sufficiently affected by the injury. Such a factual finding is given a presumption of correctness, rebuttable only by showing a defect in the fact-finding procedures. *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254(d). The jury considered the appropriate evidence and found against him. On the record in this case, there is no basis for disturbing the jury's finding.

This court cannot say that the result is contrary to constitutional law. Therefore, petitioner's argument that his death sentence is unconstitutionally disproportionate to his personal blameworthiness must be rejected.

Petitioner also argues that his execution would be contrary to the Eighth Amendment because it would serve no legitimate penological purpose. *See Spaziano v.*

*Florida,* 468 U.S. 447, 460 n. 7, 104 S.Ct. 3154, 3162 n. 7, 82 L.Ed.2d 340 (1984). The state asserts that the death sentence here serves the same penological purposes as any death sentence—punishment and general deterrence. *See generally Gregg v. Georgia,* 428 U.S. 153, 181–84, 96 S.Ct. 2909, 2928–30, 49 L.Ed.2d 859 (1976). Petitioner's argument is that his brain injury diminished his personal blameworthiness to the point where any retributive value to petitioner's execution is insufficient. *Cf. Tison,* 481 U.S. at 148–49, 107 S.Ct. at 1683–84. The general deterrence value is also diminished, petitioner argues, because individuals with brain injuries such as his cannot be rationally deterred since they are not in control of their actions. *Cf. Ford,* 477 U.S. at 407, 106 S.Ct. at 2600.

This argument is, however, answered by the same points as petitioner's proportionality argument, above. It was a question of fact whether the causal relationship between petitioner's brain injury and his crimes was such that his personal blameworthiness was diminished. The jury heard the evidence, including the expert testimony. The jury found against petitioner. That finding was supported by the evidence, and this court cannot say that the result was contrary to the constitution.

For the reasons stated, petitioner's claim that his death sentence violates the Eighth Amendment must be dismissed.

## VI.

Petitioner argues that his right to a fair trial was violated by an improper jury instruction given during deliberations after a juror was substituted and after selection of a foreperson.

When the issue of petitioner's guilt was submitted to the jury, the jurors began deliberations immediately. They chose a foreperson and asked for the testimony of two witnesses. 23 RT 143–49. At the same time as the request for the testimony, one juror informed the trial judge that she was physically and psychologically uncom-

---

the lobectomy, Dr. Thompson, a psychiatrist and Dr. Holtz, a neurologist. Dr. Berg, a psy-

chologist, testified on behalf of the state.

fortable in the jury deliberations. 23 RT 148–49. The court suggested that the jury reconvene the next day, with that juror being permitted to cause the deliberations to recess whenever she needed to leave the jury room for air. 29 RT 149. The next day, the juror informed the judge that the deliberations were aggravating a medical condition and that she was in considerable pain. 24 RT 1–2. The trial judge then dismissed her and replaced her with an alternate, a procedure to which both prosecution and defense agreed. 24 RT 1–2.

The trial judge then gave the jury, including the new juror, the following instruction:

> I want to, ladies and gentlemen, impress upon the twelve jurors that have been deliberating, fortunately the deliberations have not gone too far at this point, but the Court is compelled under the law to admonish you that you are to start your deliberations from scratch because, obviously, Mrs. McHenry [the substituted alternate] has not had the benefit of whatever discussions you have had so far. So please do that as soon as you retire to the jury deliberation room. Start your discussions from scratch so that Mrs. McHenry has the full benefit of everything that has gone on between the jury up to the present time.

> At the present time we have the latest request. We have, which I think I placed on the record last evening, was, 'Can we please hear the testimony from Deputy T. Johnson and Deputy Sutter in the morning.' Signed by Miss Johanna Billecci, [the elected foreperson], yesterday's date of July 12th, 1983.

> Once again, Mrs. Billecci, we have prepared a copy of the transcript of the testimony of both the officers that you have requested. I am going to have the bailiff give you this as soon as you retire to the jury deliberation room.

> •    •    •    •    •

> Normally what we do, we are facilitating the procedure a little bit. Normally we would be having the court reporter read back all the testimony. And that would be the entire testimony because that's what you requested.

> So, Mrs. Billecci, I am instructing you to please read all of the testimony, that all the jurors should read all the testimony of both the officers which you requested.

24 RT 2–3. The twelve jurors, the eleven original jurors and the substituted alternate, retired to the deliberation room. 24 RT 3–4.

Petitioner argues that the post-substitution instruction was erroneous and that he was prejudiced by the error. The state appears to admit that there was error in the trial judge's language, but denies that there was any prejudice, and as a threshold matter, asserts that the issue is not of federal constitutional dimension. The California Supreme Court, in affirming petitioner's conviction and sentence, assumed that there was error in the instruction but found no prejudice to petitioner. *Odle*, 45 Cal.3d at 405–06, 247 Cal.Rptr. 137, 754 P.2d 184.

■  Federal habeas corpus is not available for attacks on violations of state law or procedure. A state prisoner can obtain federal habeas corpus relief only if he is held in violation of the Constitution, laws or treaties of the United States. *Engle v. Isaac*, 456 U.S. 107, 119, 120 n. 19, 121 n. 21, 102 S.Ct. 1558, 1567, 1567 n. 19, 1568 n. 21, 71 L.Ed.2d 783 (1982).

Petitioner asserts that the Sixth Amendment's guarantee of the right to a jury trial, applicable to the State of California through the Fourteenth Amendment, is violated in cases such as this if the verdict is not the product of the deliberations of all of the jurors. The cases involving the substitution of jurors during deliberations are less than clear on this argument. The cases tend to rely on applicable *state* laws governing substitution of jurors. *See, e.g., United States v. Lamb*, 529 F.2d 1153 (9th Cir.1976) (relying on Fed.R.Crim.P. 24(b), (c)); *People v. Dry Land Marina, Inc.*, 175 Mich.App. 322, 437 N.W.2d 391 (1989) (Mich.Crim.R. 6.102(A)), *app. denied*, 433 Mich. 916 (1989), *cert. denied*, ── U.S. ──, 110 S.Ct. 2170, 109 L.Ed.2d 499

(1990); *People v. Ford,* 145 Misc.2d 308, 546 N.Y.S.2d 313 (Sup.Ct.1989) (N.Y. State Constitution); *People v. Burnette,* 775 P.2d 583 (Colo.1989) (Colo.R.Crim.P. 24(e)). It is arguable that many of these cases have impliedly recognized the constitutional nature of the issue. *See, e.g., Ford,* 546 N.Y.S.2d at 316 ("fair trial and due process"); *Burnette,* 775 P.2d at 586 (Sixth and Seventh Amendments); *Lamb,* 529 F.2d at 1159.

In *Miller v. Stagner,* 757 F.2d 988, 995 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986), this issue was before the Ninth Circuit on federal habeas corpus. The court did not question the federal constitutional dimension of the claim. It considered the issue and, on the facts presented, found no violation of petitioner's federal constitutional rights:

> The discharge and replacement of the jurors did not violate appellants' federal constitutional rights. The California substitution procedure followed by the trial court preserved the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments.

*Id.* (footnote and citations omitted); *see also Henderson v. Lane,* 613 F.2d 175 (7th Cir.), *cert. denied,* 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980). This court will assume that this claim is cognizable on federal habeas, because it implicates the guarantees of the Sixth and Fourteenth Amendments to the constitution, and will therefore consider the merits of petitioner's claim.

■ The post-substitution instruction given by the trial judge is claimed by petitioner to be erroneous. In California, an alternate juror may be substituted after deliberations have begun if a juror is found incapable of continuing to serve. Cal.Pen. Code § 1089. The California Supreme Court has held that if substitution under section 1089 is made after deliberations have begun, the trial court must admonish the jury to begin its deliberations anew, disregarding all previous deliberations. *People v. Collins,* 17 Cal.3d 687, 693, 131 Cal.Rptr. 782, 552 P.2d 742 (1976), *cert.*

*denied,* 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977). The court stated:

> The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that twelve jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations. The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity.

*Collins,* 17 Cal.3d at 693, 131 Cal.Rptr. 782, 552 P.2d 742.

Courts in other jurisdictions have agreed that the only way to "cure" a substitution is to instruct the jury to begin its deliberations anew and disregard all that had gone before in the jury deliberations. *E.g., United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *United States v. Hillard,* 701 F.2d 1052 (2d Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *United States v. Barone,* 83 F.R.D. 565 (S.D.Fla.1979).

The constitutional question in this case is whether the "essential features" of the jury required by the Sixth and Fourteenth Amendments were preserved by the instructions of the trial court. *Stagner,* 757 F.2d at 995; *Henderson,* 613 F.2d at 177. The "essential features" of a jury were

defined in *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970) (cited with approval in *Stagner*) as:

> [T]he interposition between the accused and his accuser of the common-sense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.

In this case, the trial judge instructed the eleven principal jurors to give the substituted juror the "full benefit of everything that has gone on between the jury up to the present time." 24 RT 2. Additionally, the judge permitted the pre-substitution election of the foreperson to stand and accommodated the pre-substitution request for testimony. This would seem to contravene the requirement of instructing the jury to begin anew and to disregard all that had gone before. The California Supreme Court assumed that there was instructional error here, and analyzed its prejudicial effect on petitioner. *See Odle*, 45 Cal.3d at 405, 247 Cal.Rptr. 137, 754 P.2d 184.

The federal constitutional analysis is somewhat different. It does not turn on whether there was error under state law or its resulting prejudice. The sole question is whether the essential features of the right to a trial by jury were preserved. In *Stagner*, two jurors were dismissed on the fifth day of deliberations. The judge then instructed the jury to "set aside and disregard earlier deliberations and to begin deliberations anew." *Stagner*, 757 F.2d at 995. The Ninth Circuit held that this did not compromise the essential features of the right to trial by jury. *Id.* In *Henderson*, after two and one half hours of deliberations, a juror suffered a heart attack. An alternate juror—who admitted that he had discussed the case with his wife, but stated that his wife had expressed no opinion on the facts—was substituted, and a guilty verdict was reached within five hours. The case makes no mention of any instruction to disregard prior deliberations and to begin anew. *Henderson*, 613 F.2d at 176–77. The Seventh Circuit held that "the essential feature of the jury was preserved [and] the

defendant's Sixth Amendment challenge to the substitution procedure must fail." *Id.* at 179.

In the present case, the jury had met for only a portion of one afternoon. There is no indication that the jury did anything more than elect its foreperson and request the reading of some testimony. There is no evidence that the alternate juror had discussed the case with anyone prior to being substituted onto the jury. The jury deliberated for over two days after the substitution. And there is no indication of coercion or undue influence among the jurors after the substitution.

Further, the instruction was not altogether erroneous. Although it did contain some erroneous language, it also directed the jurors to begin their deliberations "from scratch," and to do so immediately upon re-entering the jury deliberation room.

On this record, and in light of *Miller* and *Henderson*, this court holds that the essential features of the jury trial were not compromised, and petitioner's claim of constitutional error must be dismissed.

## VII.

Petitioner claims that he was deprived of his constitutional right to be present in the courtroom during a part of his trial.

During the jury deliberations, defendant requested that he be allowed to waive his right to be present in the courtroom for proceedings to be handled outside the presence of the jury. The trial judge granted that request. 23 RT 147–48. One such proceeding was handled in chambers and outside the presence of the jury. 23 RT 147. Thereafter, other issues arose which were handled in the presence of the jury and in the absence of petitioner. 23 RT 148. During these later proceedings, defense counsel agreed that petitioner's absence was "pursuant to an agreement ... already put on the record." 23 RT 148.

Petitioner argues that he has a constitutional right to be present at all times during the case. This is partially

true. The Fourteenth Amendment guarantees an accused the right to be present at his defense of the charges against him. *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). That right, however, does not extend to every conceivable aspect of the defense. Rather, it is a right to be present "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 107–08, 54 S.Ct. at 333. In other words, petitioner must show some prejudice occasioned by his absence before his absence rises to the level of a constitutional violation. *See Bustamante v. Eyman*, 456 F.2d 269 (9th Cir.1972) (remanding case for determination of prejudice).

■ In this case, petitioner's counsel waived the right to be present for certain proceedings and the trial court accepted the waiver. Petitioner now contends that where the right to be present exists, it was not waivable. Petitioner appears to be correct, at least as to proceedings before the jury. This principle applies with special force in the context of a capital trial. *Diaz v. United States*, 223 U.S. 442, 445, 32 S.Ct. 250, 251, 56 L.Ed. 500 (1912) (accused charged with a capital crime is incapable of waiving the right to be present); *Eyman*, 456 F.2d at 274. The trial judge erred in accepting the waiver. The California Supreme Court reached the same conclusion. *Odle*, 45 Cal.3d at 407, 247 Cal.Rptr. 137, 754 P.2d 184 ("The court did err in allowing discussion in the presence of the jury when defendant was absent").

■ The question is whether petitioner was prejudiced. The standard for determining whether constitutional error is harmless is proof "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The state argues that petitioner was not prejudiced, and the California Supreme Court agreed, holding that the error was harmless. *Odle*, 45 Cal.3d at 407, 247 Cal. Rptr. 137, 754 P.2d 184. In support of its

holding, the California court noted that defense counsel was present at all times and participated in the decisions being made. *Id.* The court also noted that the "defendant's absence was adequately explained to the jury such that no injurious inferences could have been drawn simply by the fact of his absence from the courtroom." *Id.*

In *Eyman*, an appeal from the denial of habeas corpus, the Ninth Circuit said that "[t]he defendant's right to be present at all proceedings of the tribunal which may take his life or liberty is designed to safeguard the public's interest in a fair and orderly judicial system." *Eyman*, 456 F.2d at 274–75. It held that a defendant's absence from the courtroom cannot be harmless *per se, id.* at 275, but that there must be some showing that the error did not cause prejudice. *Eyman*, 456 F.2d at 274 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). The case was remanded for a determination of whether the error was harmless. *Eyman*, 456 F.2d at 274–75. On remand, the district court held that the error was harmless, and that holding was affirmed on appeal. *Bustamante v. Cardwell*, 497 F.2d 556, 557–58 (9th Cir.1974).

The Ninth Circuit gave some indication of what may constitute harmless error in this situation. Because the district court had been without the benefit of a reporter's transcript of the trial, the record on appeal was sparse. In noting that the record was inadequate to determine whether the error was harmless, the court stated:

[t]he record does not disclose what, if anything, the judge said to the jury, or the contents of any other dialogue which may have transpired.... Nor does the record show whether the tape recording [of the jury instructions played back in defendant's absence] was a full, complete and accurate recording of the original instructions, whether the jury could hear it, or even whether all members of the jury were present.

*Eyman*, 456 F.2d at 275.[9]

The reasons given by the California Supreme Court for finding that the error was

harmless—defense counsel's presence and the explanation to the jury—are not conclusive on the federal constitutional issue. Defense counsel's presence cannot alone cure the error. Defense counsel is present in all but the most unusual of circumstances. *Eyman* stated that counsel's presence "is no substitute for the presence of the defendant himself." *Id.* at 274. There is little in the record of the explanation to the jury of petitioner's absence. The only passage that makes mention of it reads as follows:

> THE COURT: The record should show that the jury is present, and that both counsel are present, Mr. Gagen and Mr. Yancy. Mr. Odle is not present, but I believe that this is pursuant to an agreement that Mr. Gagen has already put on the record to the effect that it would not be necessary for him to be here at this time.

23 RT 148.

However, the record discloses that no irregularities such as those discussed by the *Eyman* court occurred in the courtroom during petitioner's absence. In *Eyman*, the defendant never knew of or consented to his counsel's waiver of his right to be present. Here petitioner waived his right retrospectively, the day after his absence. 24 RT 1–2. That is some evidence of the harmlessness of the proceedings in his absence, although it is by no means dispositive. The nature of the proceeding that took place in petitioner's absence, fully reported on the record, is also relevant. The court, counsel and the jury focused on two matters: the logistics of providing the jury with transcripts of the testimony that it had requested, and the physical difficulties that one juror was experiencing in the deliberation room. Neither of those matters involved the facts of the case or the applicable law. No testimony or other evidence was taken. The participants focused only on the physical and logistic concerns of the jury, and not on petitioner or the substance of the charge. *See* 23 RT 146–48; 24 RT 1–5. There was nothing which

petitioner could have contributed to the subjects discussed. And although the trial judge's discussion of petitioner's absence was inadequate, the jury was at least advised that he was absent by agreement, so that no adverse inference would be drawn against petitioner by the jury. Finally, as the California Supreme Court noted and the record shows, the evidence of potential guilt was overwhelming. *Odle*, 45 Cal.3d at 147, 247 Cal.Rptr. 137, 754 P.2d 184.

For these reasons, this court holds that the error of petitioner's absence from the courtroom was harmless beyond a reasonable doubt. Petitioner's claim of a constitutional violation must therefore be dismissed.

## VIII.

■ Petitioner claims that his constitutional rights were violated because the jury was not instructed as to the elements of the special circumstance of murder of a peace officer under Penal Code section 190.2(a)(7).

Under California law, before a defendant can be sentenced to death he must be found guilty of first degree murder, and the jury must find at least one of the statutory "special circumstances" to be true. Section 190.2 of the Cal.Penal Code defines those special circumstances. If the defendant is found guilty of murder, and if one of the charged special circumstances is found by the jury, the trial proceeds to the penalty phase. *Id.* at § 190.3.

Petitioner was charged with several special circumstances. The jury found true the following four special circumstances: with respect to the murder of Rena Aguilar, multiple-murder, Cal.Penal Code § 190.2(a)(3); with respect to the murder of Officer Floyd Swartz, multiple-murder, *id.*, murder to avoid arrest, § 190.2(a)(5), and murder of a peace officer, § 190.2(a)(7). *See Odle*, 45 Cal.3d at 394, 247 Cal.Rptr. 137, 754 P.2d 184.

tiary hearing on the question of prejudice. Based on the evidence at the hearing, the district court concluded that no prejudice came to

defendant as a result of his absence. In the present case, this court does have a reporter's transcript.

Among those was section 190.2(a)(7), murder of a peace officer. However, the trial court omitted to instruct the jury on the elements of that special circumstance. The other special circumstances were covered in the jury instructions. 23 RT 121–22. But the special circumstance of murder of a peace officer appears nowhere in the instructions. Both the state and the California Supreme Court agree that this was error. Ans.Mem. at 50–51; 45 Cal.3d at 410, 247 Cal.Rptr. 137, 754 P.2d 184.

■ Was the error harmless? Capital cases are not *per se* exempt from harmless error analysis. *See Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Petitioner argues that an instructional error such as this one is not subject to a harmless error analysis under *Chapman v. California*. In *Chapman*, the U.S. Supreme Court noted several categories of constitutional errors that are harmful *per se* and are not subject to harmless error analysis. The Court cited as examples: *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (denial of right to counsel); *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (introduction of coerced confession); and *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudication by biased judge). Since *Chapman*, the Court has added to the list of constitutional violations that merit *per se* reversal. *E.g., Waller v. Georgia*, 467 U.S. 39, 49 & n. 9, 104 S.Ct. 2210, 2217 & n. 9, 81 L.Ed.2d 31 (1984) (public trial); *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (conflict of interest in representation); *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (self-representation); *Price v. Georgia*, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) (double jeopardy). Nonetheless, "errors to which *Chapman* does not apply ... are the exception and not the rule." *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986).

Petitioner cites *Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983). In *Johnson*, the Supreme Court held that "*Sandstrom* [*v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)] error"—instructing the jury that "the law presumes that a defendant intended the consequences of his acts"—could be held to be harmless in only very limited circumstances. *Id.* at 87–88, 103 S.Ct. at 977–978. This was because such an instruction involved "constitutional rights so basic to a fair trial" that their infraction can almost never be treated as harmless error. *Id.* at 88, 103 S.Ct. at 978. But *Johnson* is of dubious value to petitioner. The present case does not involve an erroneous instruction on an essential element of one of the crimes charged, as did *Johnson*. Here, the instructional error was in connection with a special circumstance, which arguably became superfluous to the determination of guilt when any one of the *other* special circumstances, which were properly instructed, were found by the jury to be true. *See* Cal.Penal Code § 190.3.

Even if the trial court had ordered the uninstructed special circumstance stricken, petitioner would still have been subject to the death penalty. Any one of the other three special circumstances, all of which were properly instructed and found true, sufficed to subject petitioner to the death penalty. This case would be different if only one special circumstance had been charged, or if the error extended to all of the special circumstances. On this record, however, this court concludes that the harmless error rule of *Chapman* applies, and the error at petitioner's guilt trial was harmless.

■ The remaining issue concerns the use of those special circumstances as aggravating factors in the penalty trial. Under Cal.Penal Code section 190.3(a), any of the special circumstances found to be true can be considered as an aggravating circumstance in the penalty trial. They must be weighed against any mitigating circumstances in determining the appropriate penalty—life without possibility of parole or death. *Id.* at § 190.3. Petitioner argues that he was prejudiced by use of the section 190.2(a)(7) special circumstance as an

aggravating circumstance at the penalty trial.

The Ninth Circuit considered a nearly identical situation in *Harris v. Pulley*, 692 F.2d 1189, 1203 (9th Cir.1982), *rev'd on other grounds*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Harris*, the state had charged Harris with two murders and three special circumstances *for each murder:* (1) multiple murders; (2) murder during robbery; and (3) murder during kidnapping. *Id.* "Thus, Harris was charged with six special circumstances, all of which the jury unanimously found to be true beyond a reasonable doubt." *Id.* Harris argued that these charges were so unlawfully duplicative that he was prejudiced, because they "artificially inflated the aggravating factors considered by the jury in determining Harris' penalty." *Id.*

The Ninth Circuit seemed to assume that the double charging was error. Nonetheless, the court stated:

> We conclude that the jury could not have been misled in this case by the duplicative charging of special circumstances. It was clear throughout the trial that two murders, and not four, were committed and that both murders arose out of the same incident. It is highly unlikely that the jury simply counted up the special circumstances charged and based its verdict on such calculation. We cannot reverse on the basis of speculation of that nature.

*Id.*

Implicit in the court's holding is that this type of error, jury instructions resulting in undue inflation of aggravating factors at the penalty trial, is subject to harmless error analysis. The Supreme Court of California came to the same conclusion, through a broader holding, in the present case. It held that *Chapman* harmless error analysis applies to instructional errors, even if the erroneous instructions had the effect of removing from the jury's consideration an element of the substantive offense. *Odle*, 45 Cal.3d at 414–15, 247 Cal. Rptr. 137, 754 P.2d 184.

The Ninth Circuit identified two factors that rendered the error harmless in *Harris:*

(1) the clarity from the record of the facts charged, despite the duplicative charging of the special circumstances; and (2) the remoteness of the possibility that the jury performed a mechanical counting up of factors in aggravation and in mitigation and based its decision on which had registered more tallies. *Harris*, 692 F.2d at 1203.

In this case, both of these factors are present. First, there was likewise a clear record of what was being charged. Petitioner does not argue that the jury was misled or confused as to precisely what acts petitioner was charged with committing. Second, the jury was expressly instructed *not* to count up the mitigating and aggravating factors in a mechanical fashion. The trial court's final instruction to the jury at the penalty trial admonished:

> In determining whether or not the aggravating circumstances outweigh the mitigating circumstances, you are not to single—you are not to simply count up the number of circumstances and decide whether there are more of one than the other. The final test is in the relative weight of the circumstances, not the relative number.
>
> One mitigating circumstance alone can be found by you to balance or outweigh any number of aggravating circumstances.

29 RT 95–96.

Additional instructions to the jury indicate that the claimed error was harmless in the penalty trial. During the guilt trial, petitioner argued that two of the special circumstances charged, murder of a peace officer and murder to avoid arrest, were duplicative or at least substantially overlapping. 11 RT 67–69, 80–85. Petitioner's position was that only one could be used as an aggravating factor. The trial court ultimately agreed and instructed the jury, in the penalty trial, that it was to consider only one of those two special circumstances in aggravation, the murder of a peace officer:

> As required by law the prosecution has elected to drop one of the special circumstances which you found to be true in the murder of Floyd Swartz. The special

circumstance that has been dropped and is not to be considered by you in your deliberations on the penalty phase is the allegation that the defendant was avoiding and preventing a lawful arrest by officer Floyd Swartz.

29 RT 90–91. Thus, the jury was instructed to disregard one special circumstance. This instruction does its part in alleviating the possibly of prejudice resulting from an unwarranted accumulation of special circumstances as aggravating factors.

The *Harris* decision controls petitioner's claim here. Not only were the two concerns of the *Harris* court met here, but the record also discloses additional safeguards against the danger of leaving the jury with an incorrect understanding of the evidence and task before it.

Therefore, petitioner's claim that the trial court's failure to instruct the jury on the special circumstance of murder of a peace officer was constitutional error must be dismissed.

### IX.

Petitioner claims that he was denied the effective assistance of trial counsel because counsel did not offer evidence regarding his brain injury during the penalty phase of his trial.

■ Such a claim is measured by the standards of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), which requires petitioner to show both (1) the incompetence of his counsel, and (2) that the incompetence resulted in prejudice to him. As stated in *Strickland*, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. Petitioner bears the burden of proving that his counsel's representation was unreasonable under prevailing professional norms, and that the challenged action was not sound strategy. *Id.* at 688–89, 104 S.Ct. at 2064–65. Reasonableness is to be evaluated from counsel's perspective at the time, and the standard of review is highly deferential. *Id.* at 689, 104 S.Ct. at 2065. Petitioner must also show that he was prejudiced by the alleged ineffectiveness. He

must do so by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. In determining the existence of prejudice, the court "must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. at 2069.

■ As stated, petitioner charges that at the penalty trial his counsel did not offer evidence of his brain defect. The record is clear that substantial evidence of petitioner's brain condition was offered and heard by the jury during the guilt phase of the trial—indeed, that was his primary defense—and the penalty jury was instructed to consider all of the evidence in both phases. The state argues that counsel's decision not to offer additional evidence of petitioner's brain condition was a tactical decision and was not ineffectiveness; and that even if it were ineffectiveness, petitioner was not prejudiced.

Petitioner requests an evidentiary hearing on this claim. He seeks to put on the testimony of at least petitioner himself, two mental health experts, and petitioner's trial counsel. The first question therefore is whether an evidentiary hearing is required. In *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the U.S. Supreme Court established the standards under which a federal district court, sitting in habeas corpus, is required to hold an evidentiary hearing after a state court conviction: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 313, 83 S.Ct. at 757.

Insofar as it appears from the record, no evidentiary hearing was held during petitioner's state court proceedings on the issue of the claimed ineffectiveness of coun-

sel. However, no evidentiary hearing is necessary here if the contents of the trial record are sufficient to resolve the issue, or the allegations, even if true, fail to present a basis for relief. *Van Pilon v. Reed,* 799 F.2d 1332, 1338–39 (9th Cir.1986); *Edgemon v. Lockhart,* 768 F.2d 252, 255 (8th Cir.1985).

Petitioner cites *United States v. Burrows,* 872 F.2d 915 (9th Cir.1989), in which an evidentiary hearing was required to assess petitioner's claim of ineffective assistance of counsel based upon counsel's failure to present mental impairment evidence. Petitioner also cites *Middleton v. Dugger,* 849 F.2d 491 (11th Cir.1988), in which a death verdict was overturned because of counsel's failure to investigate or present mitigating evidence of petitioner's mental deficiencies. However, the mere citation of cases only goes so far. In *Burrows* and *Middleton,* counsel did not investigate a mental impairment defense, or present evidence of mental impairment at the guilt trial. *Middleton* 849 F.2d at 493; *Burrows* 872 F.2d at 918. This court must resolve petitioner's claim based upon the record and the offered evidence in this case.

After reviewing the record, this court is of the opinion that even if petitioner's offered testimony were heard and given full weight in petitioner's behalf, it would still not establish the ineffectiveness and prejudice required by the *Strickland* standard. This court therefore denies petitioner's request for an evidentiary hearing.

Petitioner offers the testimony of two mental health experts as to what they would have testified if they had been called as witnesses during the penalty trial. Both of those experts testified during the guilt trial. And during the guilt trial there was extensive evidence of petitioner's mental impairment. See 21 RT 12–162. Petitioner argues that the two experts would testify to matters different from and in addition to their testimony during the guilt trial. However, the thrust of the evidence is essentially the same; that is, that petitioner had a lobectomy and how the lobectomy affected his mental processes. That subject was explored exhaustively in the guilt trial. And their possible opinions that petitioner's impairment fit within the enumer-ated mitigating circumstances of CALJIC 8.84.1 is of doubtful admissibility as proper expert testimony.

The jury was specifically told by counsel that, with exceptions not relevant to this claim, it could consider all of the evidence that it had heard in the trial "beginning with the guilt phase through the penalty phase." 29 RT 9. And the jury was told by the court that it "shall consider all of the evidence which has been received during any part of the trial of this case." 29 RT 89.

This court will assume that petitioner's trial counsel, if called to testify at an evidentiary hearing, would testify on petitioner's behalf that his decision not to offer additional mental impairment evidence in the penalty trial was not just a tactical decision. However, it is obvious from the trial record that petitioner's counsel not only investigated and presented evidence of petitioner's mental impairment during the guilt phase, but counsel did a thorough job in doing so. His investigation and presentation of that evidence was extensive. Regardless of any actions that might have made his representation of petitioner more effective in hindsight, his performance cannot be said to have been constitutionally ineffective under the *Strickland* standard.

Neither counsel nor this court have been able to discover any case in which counsel who offered even a modest mental impairment defense was held to be ineffective for failing to present an even better one. To the contrary, in *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), the Supreme Court held that defense counsel's representation was not constitutionally ineffective, even though counsel allegedly made only a partial investigation into potentially mitigating evidence and presented none in the penalty trial. *Id.* at 794–795, 107 S.Ct. at 3125–3126.

In deciding in favor of the death penalty here, petitioner's jury fairly had before it the relevant evidence of petitioner's mental condition. The jurors knew that he had a lobectomy. They heard testimony on the possible effects of that lobectomy. And they were instructed to consider that evidence during their penalty phase delibera-

774

tions. Petitioner's present arguments and offered evidence, even if accepted to the fullest extent in petitioner's favor, do not establish that petitioner's counsel was ineffective or that petitioner was prejudiced under the *Strickland* standard. Petitioner's claim must therefore be dismissed.

## X.

IT IS THEREFORE ORDERED that the petition for a writ of habeas corpus is denied.

Since this opinion and order constitutes a final disposition of this petition by this court, the stay of execution previously ordered by this court is vacated. If petitioner applies for a certificate of probable cause for appeal and the certificate is issued, this court will grant a stay of execution which will continue in effect until the Court of Appeals acts upon the appeal or the order of stay, pursuant to N.D.Cal.Local R. 296–8(f).

The Clerk of the Court is directed to immediately notify the Clerk of the United States Court of Appeals for the Ninth Circuit of the issuance of this order.